## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

TALISON CUNNINGHAM,

       Plaintiff,

vs.                                                                 No. CIV 12-329 LFG

MICHAEL J. ASTRUE,
Commissioner of Social Security,

       Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** is before the Court on Plaintiff Talison Cunningham's ("Cunningham")

Motion to Reverse and Remand for Rehearing with Supporting Memorandum, filed August 20,

2012. [Doc. 22.]  The Commissioner of Social Security issued a final decision denying benefits,

finding that Cunningham was not entitled to disability insurance benefits ("DIB").   The

Commissioner filed a response to Cunningham's motion [Doc. 24], and Cunningham filed a reply

[Doc. 27].  Having considered the pleadings submitted by the parties, the administrative record and

the applicable law, the Court grants the motion to reverse and remand, and awards benefits, as

described below.

## I.      PROCEDURAL BACKGROUND

On October 31, 2006, Cunningham applied for DIB [AR 13, 32], alleging that he was

disabled as of July 23, 2004,[1] due to a 1997 workplace injury to both feet.  In 1997, Cunningham

---

[1]Cunningham's DIB application form states an onset date of December 6, 2005 [AR 118], but
there is documentation in the record that he no longer could work as of July 23, 2004, and that he
amended the onset date to July 2004. [AR 31-32, 34, 118.]  He was last insured as of December 31, 2009.
[AR 15, 138.]

fell about 15 feet from a roof, landing on his feet and causing numerous fractures to both feet that required multiple surgeries through the years. [AR 16-17, 356.] He alleges disability based on bilateral tarsal tunnel syndrome, bilateral arthritis to his feet, the subsequent, required surgeries, and foot pain. [AR 74, 118, 148, 160.]  Cunningham's DIB application was denied at the initial and reconsideration levels. [AR 13, 72-74, 82.]  On October 28, 2008, ALJ Barbara Perkins held an administrative law hearing in Albuquerque, at which both Cunningham and counsel were present. [AR 27-70.] The ALJ did not issue a decision denying Cunningham's DIB application until almost two years later, on September 20, 2010. [AR 13-22, 200.]  On October 14, 2010, Cunningham filed a request for review. [AR 8.] On February 2, 2012, the Appeals Council reviewed the case along with Cunningham's attorney's letter, other correspondence, and additional medical information. [AR 1, 4, 5.] The Appeals Council denied the request for review. [AR 1-5.]  On March 30, 2012, Cunningham filed a Complaint for court review of the ALJ's decision. [Doc. 1.]

Cunningham was born on September 23, 1965, and was 43 years old at the time of the ALJ hearing. [AR 20, 34.] He obtained a high school education. [AR 34.] He served in the military, working as a mechanic, from 1987-1990. [AR 118, 149.] His past relevant work was as a construction laborer (1989-1990), rigging superintendent in the machinery moving business (1990-11/13/2004), and foreman for a "crane-heavy hauling company" (3/04-6/28/04). The work included heaving lifting and equipment operations. [AR 35-36, 149-153.]

Cunningham is married and has four children. [AR 119.]

His earning records indicate little to no earnings from 1981-1988. During his military service, he earned about $10,000 to $12,000 annually. In 1992 through 1994, his annual earnings ranged from $14,000 to $31,000. From 1995 through 2003, Cunningham's annual earnings ranged

from $27,000 to $51,000 (he earned lower salaries during years immediately after the 1997 accident). In 2004, Cunningham earned about $21,000. [AR 123-24.]

## II.   STANDARDS FOR DETERMINING DISABILITY

In determining disability, the Commissioner applies a five-step sequential evaluation process.[2] The burden rests upon the claimant to prove disability throughout the first four steps of this process, and if the claimant is successful in sustaining his burden at each step, the burden then shifts to the Commissioner at step five. If, at any step in the process, the Commissioner determines that the claimant is or is not disabled, the evaluation ends.[3]

Briefly, the steps are: at step one, claimant must prove he is not currently engaged in substantial gainful activity;[4] at step two, the claimant must prove his impairment is "severe" in that it "significantly limits [his] physical or mental ability to do basic work activities . . . .;"[5] at step three, the Commissioner must conclude the claimant is disabled if he proves that these impairments meet or are medically equivalent to one of the impairments listed at 20 C.F.R. Part 404, Subpart P, App. 1 (1999);[6] and, at step four, the claimant bears the burden of proving he is incapable of meeting the physical and mental demands of his past relevant work.[7] If the claimant is successful at all four of the preceding steps, the burden shifts to the Commissioner to prove, at step five, that considering

---

[2]20 C.F.R. § 404.1520(a)-(f) (1999); Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988).

[3]20 C.F.R. § 404.1520(a)-(f) (1999); Sorenson v. Bowen, 888 F.2d 706, 710 (10th Cir. 1989).

[4]20 C.F.R. § 404.1520(b) (1999).

[5]20 C.F.R. § 404.1520(c) (1999).

[6]20 C.F.R. § 404.1520(d) (1999). If a claimant's impairment meets certain criteria, that means his impairment is "severe enough to prevent him from doing any gainful activity." 20 C.F.R. § 416.925 (1999).

[7]20 C.F.R. § 404.1520(e) (1999).

claimant's RFC,[8] age, education and past work experience, he is capable of performing other work.[9]

Here, the ALJ determined at step four that Cunningham could not perform his past relevant work, but that he remained able to perform sedentary work with limitations.  At step five, the ALJ found Cunningham could perform work associated with other jobs existing in significant numbers in the national economy. [AR 20.]

## III.   STANDARD OF REVIEW

On appeal, the Court considers whether the Commissioner's final decision is supported by substantial evidence, and whether the Commissioner used the correct legal standards.  Langley v. Barnhart, 373 F.3d 1116, 1118 (10th Cir. 2004).  To be substantial, evidence must be relevant and sufficient for a reasonable mind to accept it as adequate to support a conclusion; it must be more than a mere scintilla, but it need not be a preponderance.  Doyal v. Barnhart, 331 F.3d 758, 760 (10th Cir. 2003); Langley, 373 F.3d at 1118; Hamlin v. Barnhart, 365 F.3d 1208, 1214 (10th Cir. 2004). A decision is not based on substantial evidence "if it is overwhelmed by other evidence in the record."  Wall v. Astrue, 561 F.3d 1048, 1052 (10th Cir. 2009) (internal quotation marks omitted).

The Court's review of the Commissioner's determination is limited.  Hamilton v. Sec'y of HHS, 961 F.2d 1495, 1497 (10th Cir. 1992).  The Court may not substitute its own judgment for the fact finder, nor re-weigh the evidence.  Langley, 373 F.3d at 1118; Hamlin, 365 F.3d at 1214; Hargis v. Sullivan, 945 F.2d 1482, 1486 (10th Cir. 1991).  Grounds for reversal exist if the agency fails to

---

[8]One's RFC is "what you can still do despite your limitations."  20 C.F.R. § 404.1545(a).  The Commissioner has established RFC categories based on the physical demands of various types of jobs in the national economy.  Those categories are: sedentary, light, medium, heavy and very heavy.  20 C.F.R. § 405.1567 (1999).

[9]20 C.F.R. § 404.1520(f) (1999).

apply the correct legal standards or to demonstrate reliance on the correct legal standards.  Hamlin, 365 F.3d at 1214.

It is of no import whether the Court believes that a claimant is disabled.  Rather, the Court's function is to determine whether the record as a whole contains substantial evidence to support the Commissioner's decision and whether the correct legal standards were applied.  Hamilton, 961 F.2d at 1497-98.  In Clifton v. Chater, the Tenth Circuit described, for purposes of judicial review, what the record should show:

> The record must demonstrate that the ALJ considered all of the evidence, but an ALJ is not required to discuss every piece of evidence.  Rather, in addition to discussing the evidence supporting his decision, the ALJ must discuss the uncontroverted evidence he chooses not to rely upon, as well as the significantly probative evidence he rejects.

Clifton v. Chater, 79 F.3d 1007, 1009-1010 (10th Cir. 1996) (internal citations omitted).  If supported by substantial evidence, the decision of the Commissioner is conclusive and must be affirmed.

## IV.   ALJ'S FINDINGS

In denying Cunningham's DIB application, the ALJ found that Cunningham had not engaged in substantial gainful activity subsequent to the alleged onset date of July 23, 2004 through December 31, 2009, the last date he was insured. [AR 15.]  The ALJ made the following additional findings: (1) Cunningham had severe impairments of "post traumatic residuals of right and left hind foot and mid foot fractures status post fusions of both hind feet; bilateral tarsal tunnel syndrome,[10]

_____

[10]"Tarsal tunnel syndrome (TTS), also known as posterior tibial neuralgia, is a compression neuropathy and painful foot condition in which the tibial nerve is compressed as it travels through the tarsal tunnel. This tunnel is found along the inner leg behind the medial malleolus (bump on the inside of the ankle). The posterior tibial artery, tibial nerve, and tendons of the tibialis posterior, flexor digitorum longus, and flexor hallucis longus muscles travel in a bundle through the tarsal tunnel. Inside the tunnel,

status post tarsal tunnel releases; and degenerative joint disease of the bilateral feet." [AR 15]; and (2) Cunningham did not have a medically determinable impairment or combination of impairments that met any listing.

In deciding that Cunningham did not meet a listing, the ALJ examined the requirements of § 1.03 ("reconstructive surgery or surgical arthrodesis[11] of a major weight-bearing joint . . . ."). The ALJ summarized Cunningham's surgeries, concluding that he was able to ambulate effectively between surgeries after postoperative periods not exceeding 3 months.

The ALJ next determined that Cunningham had the residual functional capacity to perform sedentary work, with these exceptions:

> he can lift and/or carry no more than 10 pounds occasionally and no more than 10 pounds frequently, sit for 6 hours out of an 8-hour work day, stand and/or walk for more than 2 hours out of an 8-hour work day and 30 minutes at a time, and push and pull with upper extremities in a manner consistent with the strength limitations just stated and with the lower extremities never. [Cunningham] can climb ropes, ladders and scaffolds never, climb ramps and stairs occasionally, balance never, stoop occasionally, knee occasionally, crouch never, and crawl never.

Cunningham had to avoid concentrated exposure to unprotected heights and to hazardous moving machinery. "Because of the distracting effects of pain and pain medications, [Cunningham] can

---

the nerve splits into three different segments. One nerve (calcaneal) continues to the heel, the other two (medial and lateral plantar nerves) continue on to the bottom of the foot. The tarsal tunnel is delineated by bone on the inside and the flexor retinaculum on the outside." "Patients with TTS typically complain of numbness in the foot radiating to the big toe and the first 3 toes, pain, burning, electrical sensations, and tingling over the base of the foot and the heel." http://en.wikipedia.org/wiki/Tarsal_tunnel_syndrome (2/11/13).

[11]"Arthrodesis, also known as artificial ankylosis or syndesis, is the artificial induction of joint ossification between two bones via surgery. This is done to relieve intractable pain in a joint which cannot be managed by pain medication, splints, or other normally-indicated treatments. The typical causes of such pain are fractures which disrupt the joint, and arthritis." http://en.wikipedia.org/wiki/Arthrodesis (2/11/13).

understand, remember, and execute no more than moderately complex instructions and tasks." [AR 16.]

The ALJ quoted some of Cunningham's hearing testimony as to his condition and limitations. She concluded that his medically determinable impairments could reasonably be expected to cause the symptoms, but that his statements regarding the intensity, persistence, and limiting effects of the symptoms were not credible to the extent they were inconsistent with the RFC. The ALJ also discussed Cunningham's alleged foot pain, finding that medical records indicated his pain was "generally well controlled with medications and improved with surgeries." The ALJ discounted Cunningham's hearing testimony concerning side effects of medications.

The ALJ further commented on some of Cunningham's medical examinations and his "wide range of daily activities, including an elk hunting trip. The ALJ considered Cunningham's wife's third-party function report. [AR 18-19.]

With respect to opinion evidence, the ALJ gave "limited weight" to the non-examining state agency physicians' opinions regarding the nature and severity of Cunningham's physical impairments. The non-examining physicians opined that Cunningham retained the ability to perform the exertional requirements of a limited range of light level work, but the ALJ gave "greater accommodation to the claimant's subjective complaints in finding that his impairments limit him to sedentary exertional level work." [AR 19.]

The ALJ also gave great weight to opinions of orthopedic specialists, who provided independent medical evaluations of Cunningham for purposes of worker's compensation benefits. [AR 19-20.] The ALJ gave "great weight" to the opinion of Dr. Panek, Cunningham's treating podiatrist. [AR 20.]

At step four, the ALJ determined Cunningham could not perform his past relevant work as he performed it. [AR 20.] In determining at step five that Cunningham was not disabled, the ALJ relied on the grids as a framework for decisionmaking.  She concluded that Cunningham's ability to perform all or substantially all of the requirements of sedentary work was impeded by additional limitations.  The ALJ then relied on testimony from a vocational expert with respect to whether such limitations eroded the unskilled sedentary occupational base.  The vocational expert testified that given all of these factors, Cunningham could perform the requirements of a dispatcher for maintenance service (DOT 239.367-014), customer service representative/order filler (DOT 249.362-026), and callout operators (DOT 237.367-014. [AR 21.] Thus, the ALJ found that Cunningham was not under a disability from July 23, 2004 through December 31, 2009. [AR 21.]

## V.    MEDICAL HISTORY AND BACKGROUND

There are a number of medical records.  Cunningham supplied a few records from 1997 when he originally injured his feet.  He provided one medical record from 1998, and another from 2003, during which time, it appears Cunningham continued to work after having the initial surgeries on his feet in 1997-98.  The majority of the medical records are from 2004-2009, with a few from 2010.

### *1997-2003 Records*

In August 1997, Cunningham was treated at Good Samaritan in Phoenix, Arizona after he slipped off a roof at work, falling about 15 feet and landing on his feet. [AR 356.] He felt a great deal of pain and was taken to the emergency room.  Xrays indicated fractures in both feet that would require surgeries. [AR 347, 365.] On August 20, 1997, Dr. Metzger performed surgery on Cunningham's right foot, noting numerous fractures.  On August 24, 1997, Dr. Metzger operated

on the left foot.  Both surgeries involved "open reduction."[12] [AR 352.] There are no more medical records during this period concerning Cunningham's recovery, although he returned to work.  On November 23, 1998, Dr. Metzger again saw Cunningham and operated to remove the plate and screws in his left foot and to excise a prominent bone spur. [AR 344.]

In early 2000, Cunningham moved to Albuquerque.  On December 4, 2003, he was seen by Dr. Mirmiran, a podiatrist.  She noted Cunningham had a total impairment of 19% at that point and that he had permanent restrictions.  He could walk four (4) hours and was restricted to four (4) hours of weight bearing work.  She opined that Cunningham would need additional surgical intervention at some point. [AR 433.]

### *2004 Records*

On March 4, 2004, Cunningham saw Dr. Panek, a podiatrist.   Dr. Panek noted that Cunningham had surgery to repair multiple fractures in his right foot and had one remaining screw in his right foot.  Cunningham also had open reduction surgery of a left calcaneal fracture.  The hardware from that foot was removed.  Cunningham was using orthotics and taking Arthrotec[13] for pain and aching with limited success.  He was currently working but was supposed to be on a limited work schedule of no more than four (4) hours standing or walking per day.  He stated that his current employer did not follow these restrictions.  Cunningham planned to move to a new job with Crane

---

[12]"The open reduction and internal fixation procedure is performed through an incision on the outside of the heel. The bone is put together and held in place with a metal plate and multiple screws. This procedure decreases the likelihood of arthritis developing and maximizes the potential for inward and outward movement of the foot.  There are times, however, when the bone is so severely smashed and fractured that, in addition to the open reduction and internal fixation, the heel joint (the subtalar joint) needs to be fused. This is done to decrease the chances of developing painful arthritis." http://www.cambridgefoot-ankle.com/Fracture_of_the_Heel_bone.php (2/11/13).

[13]"Arthrotec contains a combination of diclofenac and misoprostol. Diclofenac is a nonsteroidal anti-inflammatory drug (NSAID)."  http://www.drugs.com/arthrotec.html (2/11/13).

Services where he hoped the work would be more limited.  Cunningham reported that he felt very uncomfortable at the end of a busy day and had trouble sleeping.  He limped when on his feet a lot. He took Vicodin[14] occasionally in the evenings as needed.  Dr. Panek believed that Cunningham probably would need additional surgery.  If Cunningham remained at his current job, he would need surgery sooner than later.  He had some braces that might help.  Dr. Panek prescribed Bextra[15] and planned to follow up with xrays and a bone scan.  He wondered if injection therapy might help. [AR 265-66.]

On May 13, 2004, Dr. Panek again saw Cunningham, who brought in some xrays from 2003. Cunningham had switched jobs but he still was on his feet a lot.  His pain and aching had increased. Bextra helped somewhat, but the pain and aching on his left side could be so intense that he could not sleep.  Dr. Panek noted moderate to severe osteoarthritic change to the talonavicular joint on the right side.  He stated that Cunningham was "obviously disabled and xrays are clearly indicative of this."  Dr. Panek wanted a bone scan to confirm that there was severe arthritic change to the entirety of the left rear foot and to confirm that arthritic change to right side was isolated to the talonavicular joint.  Dr. Panel found that Cunningham's response to the fractures and injuries was "no surprise." [AR 264.]

On June 28, 2004, Dr. Panek saw Cunningham whose pain on both sides remained unchanged.  Cunningham reported that he experienced so much pain on both sides that he had to

---

[14]"Vicodin contains a combination of acetaminophen and hydrocodone. Hydrocodone is in a group of drugs called opioid pain relievers. An opioid is sometimes called a narcotic.  Acetaminophen is a less potent pain reliever that increases the effects of hydrocodone.  Vicodin is used to relieve moderate to severe pain."   http://www.drugs.com/vicodin.html (2/11/13).

[15]"Bextra is in a class of drugs called nonsteroidal anti-inflammatory drugs (NSAIDs)."  It was withdrawn from the U.S. market in 2005.  http://www.drugs.com/bextra.html (2/11/13).

take a day and a half off from work. Dr. Panek decided to order an MRI for the left foot and ankle. The bone scan showed inflammation and arthritic change to the right talonavicular joint, and it was clear on the right foot that Cunningham had intense talonavicular joint degenerative arthritis. [AR 263.]

On July 23, 2004, the onset date of disability, Cunningham complained of pain on both sides and stated he could not work. In reviewing the MRI, Dr. Panek stated it did not show any signs of ankle joint pathology on the left side but confirmed subtalar joint arthritis on the left side. Dr. Panek opined that Cunningham needed surgery on both feet – a fusion of the right talonavicular joint and left subtalar joint. He planned to do the left side first because he believed the left would fuse more quickly than the right. Cunningham wanted to have the surgeries as quickly as possible so he could return to work. Dr. Panek gave him samples of Bextra because insurance no longer would pay for it. [AR 262.]

On November 17, 2004, Dr. Leonetti, a podiatrist, performed an IME for purposes of worker's compensation. He noted that this worker's comp case closed with a 34% impairment of the right foot and a 19% impairment of the left. Cunningham moved to Albuquerque by early 2000. Dr. Panek recommended additional surgical fusion, triple arthrodesis of the left rear foot and possible fusion of the right. Thus, the worker's comp case was being re-evaluated. [AR 425-26.] Cunningham reported his pain level was, on average, a 6-7 out of 10. He had more right than left foot pain. This record reported that Cunningham had not returned to full time work since the 1997 work injury. He attempted to increase his work responsibilities at one point but his pain worsened "a lot." Thus, he worked on a modified status of standing for four (4) hours and sitting for four (4) hours. He was not using orthotics or supportive braces. [AR 428.] Dr. Leonetti's assessment was: "status post crush injury right and left foot; status post comminute fracture left calcaneus . . .

11

navicular fracture on the left."  Cunningham continued to experience weight bearing pain secondary to instability and extensive traumatic arthritis of both feet. [AR 430.]  The arthritis was causally connected to the fractures.  Dr. Leonetti agreed that Cunningham needed fusion surgery on both feet. [AR 432.]

### *2005 Records*

On January 5, 2005, Dr. Panek discussed upcoming surgery with Cunningham, particularly with respect to the planned surgical procedures for Cunningham's left heel and rear foot, including fusion of the subtalar joint and removal of boney spurring.  Cunningham was given crutches and admitted to the hospital for a few nights.  He was prescribed Percocet, a narcotic painkiller.  Dr. Panek noted that Cunningham needed surgery on his right foot as well.  His progressive degenerative arthritis had worsened over the last five years, and Cunningham was "drastically limited in activities and ambulation." [AR 260-61.] His "current occupation" was noted as rigger.

On January 12, 2005, Dr. Panek performed arthrodesis on the left side.  One week later, Cunningham's numbness around the left knee and lower extremity was resolved.  He seemed to be recovering well. [AR 259, 338.]

On January 26, 2005, Cunningham reported "on and off" intense pain to the posterior inferior left heel region over the past few days.  He was wearing a below-the-knee non-weight bearing cast.  Cunningham complained that Percocet made him dizzy.  He was prescribed Darvocet, another narcotic painkiller. [AR 258.]

On February 16, 2005, Cunningham was five weeks "status post left foot joint fusion." He drove to Santa Fe with his foot down and noticed swelling; however, he was feeling well and recovering.  He was placed in a below-the-knee weight bearing cast but was not to lift anything for one more week. [AR 257.]

12

On March 9, 2005, Dr. Panek thought the left fusion was doing well, and Cunningham was able to do some partial weight bearing activities with crutches. He felt some pain around the front of his left ankle joint and complained it felt tight and "achy" at times. [AR 256.] On April 12, 2005, Cunningham was in a weight bearing cast for three weeks. He was doing much better in the last week. He was walking in the cast with much less aching and very little pain on the left side. He felt he had "turned the corner" in his recovery. Dr. Panek placed him in a removable walking boot and stated he could tolerate some modified work duties restricted to sitting only. There was still a problem of degenerative arthritis on his right midfoot that would need surgical correction once Cunningham was fully recovered from the left foot surgery. [AR 255.]

By April 22, 2005, Cunningham was taking short walks around the house without his boot and doing well. If he was on his feet for more than 45 minutes, he had significant aching and throbbing. Cunningham was more and more comfortable with ambulation and progressing to the use of normal shoes, but was still limited. [AR 254.]

On May 27, 2005, Cunningham was doing very well. He was very active on his feet and comfortable, even for a couple of hours at a time, as long as the activity was not too straining. Simple standing and walking were tolerable. If Cunningham was on his feet too long, he had aching and swelling. Overall, he was much improved from surgery. The degenerative arthritis on the right side caused chronic pain. Dr. Panek expected to do surgery on the right side in the next few months. [AR 253.] On July 11, 2005, Cunningham saw Dr. Fontana for a preoperative physical. He was taking Celebrex[16] and Advil. [AR 227.]

---

[16]"Celebrex (celecoxib) belongs to a group of drugs called nonsteroidal anti-inflammatory drugs (NSAIDs). It works by reducing hormones that cause inflammation and pain in the body." http://www.drugs.com/search.php?searchterm=Celebrex (2/11/13).

On July 14, 2005, Dr. Panek discussed performing right talonavicular joint fusion after what was considered a successful subtalar joint fusion on the left side. Cunningham still had some hardware in the right midfoot from fractures that would be removed. Xrays revealed much degenerative and disabling arthritis to the talonavicular joint of the right foot. He was prescribed Percocet and would use crutches once home from the hospital stay. [AR 251.] On July 20, 2005, Dr. Panek performed the fusion on the right foot and removed the hardware. [AR 449.]

On August 1, 2005, Cunningham reported his pain was barely under control for the first three to four days at home but was now better. [AR 250.] On August 8, 2005, Cunningham was instructed to remain off his right foot; he felt "achiness" when on it. [AR 249.] On September 1, 2005, Cunningham stated he had fallen and landed on his foot and hip. He felt increased throbbing from the right foot's surgical site. His cast was removed. [AR 248.] On September 23, 2005, Cunningham reported that if he was on his feet for more than thirty minutes, his right foot ached as did his left. Rest helped. Xrays of his right foot looked good. [AR 247, 273, 274.]

On October 14, 2005, Dr. Panek again saw Cunningham, 10 weeks status post right talonavicular joint fusion. Cunningham was discouraged; he was not free of the aching and pain. He started using regular shoes but his pain increased on the right foot. He felt he was improving overall, but was depressed with how slow it was. Cunningham did not think he could see "the light at the end of the tunnel" or a time when he could return to work and support his family. Dr. Panek wrote that "[t]he likelihood that he will return to a job on his feet for much of the day is unlikely." Cunningham was to return to using a walking boot and to take anti-inflammatory medications. He still needed pain medication but found Vicodin unhelpful. Dr. Panek wanted to discontinue the pain medication, but he refilled it. [AR 246.]

14

On November 4, 2005, Dr. Panek noted that Cunningham complained of aching to the right foot after being on his feet for thirty minutes.  He had better days over the last few weeks and was not feeling pain or swelling to the fusion site of the right foot.  He felt pain, however, on the bottom of his right arch and over the right lateral forefoot.  Dr. Panek prescribed Celebrex and refilled Vicodin. [AR 245.]

On December 2, 2005, Cunningham reported he had not seen much improvement since the last visit.  He had difficulty walking for longer periods and felt aching and pressure to his heels.  His feet burned at times.  He continued to recover very slowly and was not showing much improvement.  Dr. Panek referred Cunningham to physical therapy. [AR 244.]

### *2006 Records*

On January 10, 2006, Dr. Panek noted that Cunningham was not yet approved for physical therapy and was doing some therapy at home.  He pushed his walking and could tolerate 20 minutes of walking before he felt "lots of pain."  He could walk more normally but he "really is often miserable."  Most days were not good.  He had "stinging type pain" on the entire bottoms of both feet, along with ankle joint pain.  His right side was worse than the left.  Activities worsened his pain.  Dr. Panek observed that the range of motion of both ankles was normal and that Cunningham was mostly recovered from the surgeries.  However, he still was in a lot of discomfort.  Dr. Panek wondered if he was developing some type of neuropathy and also could not rule out tarsal tunnel syndrome.  Dr. Panek increased his pain medication and prescribed Percocet as needed.  He gave

Cunningham samples of Mobic.[17]  Cunningham reported that Celebrex did not help much.  He was also to try Lyrica.[18] [AR 242.]

On February 10, 2006, Dr. Panek noted that Cunningham's recovery from surgeries had been slowed by hypersensitivity.  Cunningham did not feel as much stinging or aching since taking Lyrica, but Lyrica made him feel sleepy and forgetful.  Dr. Panek decreased the Lyrica and instructed Cunningham to take it at night.  He was intermittently wearing braces but unsure if they helped.  Dr. Panek refilled the Percocet prescription. [AR 240.]

On March 16, 2006, Cunningham admitted he was doing better.  He noticed most of the improvement on his left side and less improvement on the right side.  He still felt mild aching pain to the lateral midfoot bilaterally.  The pain extended to the lateral rear foot on the right and was isolated to the lateral midfoot on the left.  Cunningham was taking Percocet after physical therapy and in the evenings as needed.  He talked about the stinging pain on the bottoms of both feet.  Dr. Panek could not rule out tarsal tunnel syndrome and wanted to evaluate it.  He set up a neurological evaluation and nerve conduction studies. [AR 239.]

There is a physical therapy progress note, dated March 18, 2006, noting that Cunningham attended five appointments without any "no shows" or cancellations.  There was a 10% decrease in pain on the left side, but the right-sided pain was the same.  He still was "significantly impaired." [AR 423.]

---

[17]"Mobic (meloxicam) is a nonsteroidal anti-inflammatory drug (NSAID). Meloxicam works by reducing hormones that cause inflammation and pain in the body. http://www.drugs.com/search.php?searchterm=Mobic (2/11/13).

[18]"Lyrica (pregabalin) is an anti-epileptic drug, also called an anticonvulsant. It works by slowing down impulses in the brain that cause seizures. Lyrica also affects chemicals in the brain that send pain signals across the nervous system. Lyrica is used to control seizures and to treat fibromyalgia . . . ." http://www.drugs.com/search.php?searchterm=Lyrica (2/11/13).

On April 13, 2006, Dr. Panek saw Cunningham for stinging on the bottoms of both feet. Lyrica helped initially, but not as much recently. Cunningham was still walking about one mile a day but was limited due to the bottoms of his feet aching. He felt some aching to the lateral forefoot bilaterally. He had seen Dr. Freedman regarding tarsal tunnel syndrome and was set up for nerve conduction studies. Dr. Panek refilled the Percocet prescription. [AR 238.]

On April 20, 2006, Dr. Freedman conducted the right/left lower extremity EMG and nerve conduction studies. The study result was abnormal and suggested dysfunction on the left side. [AR 451.]

On May 11, 2006, Dr. Panek followed up with Cunningham for continued stinging and burning to the bottoms of both feet. Cunningham stated the stinging was almost the same on both sides but worse on the left side. Both ankles continued to ache and hurt. The pain increased with activity, and he occasionally suffered some intense stabbing pain to his ankle joint area. When that occurred, Cunningham had to stop whatever he was doing. He decided to discontinue physical therapy because he showed no signs of recovery. While there was little to no swelling in the areas, Cunningham's complaints were consistent with tarsal tunnel syndrome. The EMG studies were clearly abnormal on the left side but not the right. There were multiple other problems, including ankle joint pain bilaterally, right lateral rearfoot pain, throbbing ankle joint pain, etc. Dr. Panek wanted a bone scan. [AR 237.]

On May 18, 2006, there is a radiology report for the bone scan of Cunningham's feet, indicating Cunningham may have worsening osteoarthritic changes. [AR 268.] On May 26, 2006, Dr. Panek reviewed the bone scan. Cunningham was doing a bit better on the left foot but the right was generally worse. He continued to feel stinging pain on both feet that was mostly unchanged. The bone scan did not specifically indicate any treatment was needed, but Cunningham had multiple

areas of soreness and still had tarsal tunnel syndrome on both sides.  Dr. Panek injected the left foot

and refilled his Percocet.  For the first five days after the injection, Cunningham felt "really good."

[AR 236.]

On July 6, 2006, Dr. Panek noted that the injection to the left arch gave Cunningham five

days of relief from stinging pain on the bottom of his left foot, but that other areas were still painful.

Dr. Panek decided on steroid injections into areas of neuritis of the right anterior ankle joint.  If the

injections resolved most of the pain on the right foot, Dr. Panek believed that they could deal with

the tarsal tunnel issues on the left. [AR 243.]

On August 18, 2006, Dr. Steen Johnsen provided an IME evaluation of Cunningham for

worker's compensation.  Cunningham still reported pain in both foot with worse pain on the right

side.  The previous cortisone injections gave him five days of relief.  His motion was restricted in

both ankles and midfeet. [AR 416-17.] Cunningham was taking Lyrica and, occasionally, Percocet.

His hobbies had been hunting, fishing, and golfing.  Dr. Johnsen's notes are not entirely legible, but

he stated that Cunningham obviously had a significant injury and significant subsequent injury-

related surgeries.  Cunningham should get a CT scan of the midfoot and consider converting the

subtalar fusion into a full triple arthrodesis. [AR 419.] The situation was very complex.  Tarsal

tunnel syndrome was supported.  Injections might help.  Cunningham's prior disability rating was

25% of the right foot and 17% of the left.  At this point, Dr. Johnsen could not give a permanent

impairment rating because Cunningham's condition was not stationary.  Cunningham was unable

to return to his usual work but could perform light work with lifting restrictions of 10-15 pounds.

Dr. Johnsen suggested surgery for Cunningham. [AR 416.]

On August 24, 2006, Dr. Panek discussed Cunningham's appointment with Dr. Johnsen.  The

burning on Cunningham's bottom left foot resolved with an injection initially, but was continuing

and unchanged as of this date.  He had the same burning and pain to the bottom of his right foot.

Overall, Cunningham's condition and pain were unchanged.  He continued with symptoms of tarsal

tunnel syndrome on both sides but was putting off any type of surgery.  Dr. Panek was considering

a CT or an MRI. [AR 235.]

On September 22, 2006, Dr. Panek noted that Cunningham's pain was the same.  He was

focusing on the right foot pain laterally that had recently been "intense."  The pain was deep but not

radiating.  Dr. Panek planned to get an MRI and noted that he had to address the tarsal tunnel

syndrome at some point. [AR 234.]

On September 26, 2006, Cunningham had a CT scan of his right foot and ankle for persistent

pain.  There were extensive areas of osteoarthritis in multiple articulations. [AR 267.] On October

20, 2006, Dr. Panek saw Cunningham, who he described as neither better nor worse.  They talked

about the changes seen on the CT scan.  Cunningham had tarsal tunnel syndrome in both feet, but

they were delaying treatment for now so as to address the right lateral midfoot.  Cunningham was

showing progressive degenerative changes to the right lateral midfoot.  Dr. Panek discussed using

an implant or doing fusion.  At this time, Dr. Panek and Cunningham decided to wait to evaluate

how his pain developed. [AR 233.]

On October 31, 2006, Cunningham applied for DIB, initially indicating an onset date of

December 6, 2005. [AR 72, 118.]  On the same date, Cunningham filled out a disability report. [AR

137.] During the face-to-face interview, the staff member observed that Cunningham had problems

walking but that he was able to stand and "everything else." [AR 139.]

On November 28, 2006, Cunningham filled out an adult function report.  He lived at home

with his family.  His daily activities included getting his children up, cleaning up, taking his children

to school, watching the news, letting out the dog, and doing some household chores. [AR 141.]

Sometimes, he cooked, and sometimes, he helped with homework.  He fed and watered the dogs. His foot pain kept him awake at times.  [AR 142.] He had difficulty getting his shoes on if his feet were swollen, but he could perform most daily living activities.  His wife and children placed "post-it" notes around to remind Cunningham to take his medications. [AR 143.]

When cooking for his family, Cunningham suffered from pain after standing up, so, he had to sit and rest.  He did some yard work, maybe once a week for two hours.  He vacuumed for thirty minutes.  He washed dishes for an hour, once a week.  He could go outside daily and could drive a car.  He drove to the grocery store if his wife forgot something. [AR 144.] He hunted once or twice a year.  He could ride but it hurt him to walk.  He also golfed once or twice a year, but by the sixth hole he could barely walk for the rest of the day.  He used to hunt, fish and play golf throughout the year but could not do that now because of pain. [AR 145.] He seemed to be more forgetful, although he did not realize what he had forgotten. [AR 145.] He had trouble lifting, squatting, standing, walking, climbing stairs, seeing at night, and standing for more than 10-15 minutes without pain. He could not lift more than 20 pounds.  His vision was blurry at night and his memory was poor. He could walk as far as 200 yards before he needed to stop to rest for 10-20 minutes.  He used inserts in his shoes and was prescribed ankle braces.  He described degenerative arthritis in both feet, as well as tarsal tunnel syndrome.  Cunningham was in a lot of pain even when sitting.  The medications helped for short periods, but they made him sleepy and lethargic. [AR 148.]

There is another adult disability report, dated November 2006. [AR 159.] Cunningham stated he could not stand for more than ten minutes and that he was in pain all of the time. [AR 160.] He was unable to work as of December 6, 2005, although he stopped working in November 2004 because his feet began to bother him.  He took Percocet and Lyrica for pain and nerve damage although the medications caused him to feel lethargic. [AR 165.]

On December 2, 2006, Cunningham's wife filled out a third-party function report. She had known her husband for 13½ years. He could take the children to school but then came home to lay down. He fed the pets and cleaned the yard, but she and the children helped him. Before his injuries, he could walk, jump, run, hunt, fish, fix cars, barbeque, and go to parks. His pain prevented him from sleeping. Cunningham needed reminders to take his medications. He could fix a sandwich and could do the dishes. She tried not to let him do much on his feet. [AR 170.] Cunningham went outside and drove the car. He paid the bills, but his wife double-checked him. He was able to fish maybe once a year but could not hunt or golf. [AR 170-174.]

### *2007 Records*

On January 8, 2007, Cunningham reported to Dr. Panek that he was trying to live with the pain and deal with his foot issues, but his condition had worsened over the last few months. Cunningham felt he was disabled and in too much pain. He wanted to try a surgical procedure on his right foot. Dr. Panek indicated that his symptoms basically were unchanged; he continued to suffer from stinging and burning on both feet related to tarsal tunnel syndrome. The bone scan and CT showed progressive degenerative changes to the right lateral midfoot. Cunningham did not feel he could live with such disabling pain. He was taking Percocet. [AR 320.]

On February 8, 2007, Cunningham's DIB application was denied at the initial stage. Disability Services explained that his conditions were not severe enough to keep him from working. [AR 72, 74.] Also on February 8, 2007, Dr. Mark Werner, a disability services consulting physician, conducted a PRFC assessment based on the medical records. He noted diagnoses of tarsal tunnel syndrome bilaterally and bilateral foot fractures with degenerative joint disease. [AR 286.] Dr. Werner concluded that Cunningham could lift 20 pounds occasionally and 10 pounds frequently. He could stand or walk at least two (2) hours and could sit for about six (6) hours. His ability to

push or pull was unlimited.  [AR 287.] Dr. Werner considered record evidence of Cunningham's foot surgeries in 1997, 1998, and January 2005.  He noted that in May 2005, Cunningham could tolerate standing or walking for a few hours at a time.  In July 2005, Cunningham was diagnosed with disabling degenerative arthritis in the right joint and had a fusion procedure performed.  In December 2005, Cunningham had difficulties walking for long.  He complained of aching, pressure and burning in his feet and was not improving.  However, Cunningham was slowly improving from his surgery.  In October 2006, the records indicated that Cunningham had chronic pain and progressive degenerative changes to the right lateral midfoot.  He could walk 100 to 200 yards before needing to stop.  He could lift up to 20 pounds.  Cunningham had occasional limitations in his ability to climb, balance, stoop, kneel, crouch and crawl.  He should never climb ladders or ropes and was to avoid concentrated exposure to extreme cold, hazards, and heights. [AR 290.]

On March 15, 2007, Cunningham had a preoperative examination.  He stated he was primarily doing some yard work to get exercise.  He could walk several blocks. [AR 309.] On that same date, Dr. Panek noted that Cunningham was scheduled for multiple surgeries on the left foot. He was prescribed Naprosyn,[19] Lyrica and Percocet, as needed for pain.  He was in chronic pain. Nerve conduction studies were consistent with tarsal tunnel syndrome. [AR 314.]

On March 21, 2007, Dr. Panek performed surgery on Cunningham's right foot, including tarsal tunnel release. [AR 302.] On March 27, 2007, Cunningham was in "quite a bit of pain" and

---

[19]"Naprosyn (naproxen) is a nonsteroidal anti-inflammatory drugs (NSAIDs). It works by reducing hormones that cause inflammation and pain in the body. Naprosyn is used to treat pain or inflammation caused by conditions such as arthritis . . . ." http://www.drugs.com/search.php?searchterm=Naprosyn (2/11/13).

needed more Roxicet[20] and Ambien, a sleep medication. [AR 313.] On April 4, 2007, Cunningham was still hurting a lot at night.  Dr. Panek refilled the Percocet prescription. [AR 31.] On April 27, 2007, five weeks after surgery, Cunningham did not have increased throbbing or pain, and xrays indicated good positioning.  The stinging hypersensitive pain appeared to be resolved.  Cunningham was in a below-the-knee weight bearing cast for one more week. [AR 311.]

On May 7, 2007, Cunningham filled out a disability report for his appeal.  He noted changes from his last report in October 2006, including fusion surgery done on his right foot, and tarsal tunnel release in March 2007.  He was temporarily in a cast and using crutches since then. Cunningham was taking Naprosyn for inflammation due to arthritis that caused stomach cramping and Percocet for pain and nerve damage that caused lethargy.  Cunningham could not carry anything while on crutches, and it was difficult to fix a sandwich.  He was unable to take out trash or feed the dog. [AR 179-84.] Cunningham could not stand for more than 15-30 minutes at a time without needing to rest. [AR 190.]

On May 25, 2007, Dr. Kando performed a physical RFC assessment.  She noted Cunningham's diagnoses and surgeries.  She concluded he could lift 20 pounds frequently and 10 pounds occasionally.  He could stand and walk for two (2)  hours and sit for six (6) hours.  She projected that by March 15, 2008, Cunningham would be capable of sedentary work. [AR 328.] He would have occasional limitations in all categories and could never climb ladders.  While temporarily limited by recovery from surgery, Dr. Kando believed Cunningham would be capable of sedentary work in less than a year from the March 2007 surgery. [AR 327-32.]

---

[20]"Roxicet contains a combination of acetaminophen and oxycodone. Oxycodone is in a group of drugs called opioid pain relievers. An opioid is sometimes called a narcotic."  Used to relieve moderate to severe pain.  http://www.drugs.com/search.php?searchterm=Roxicet (2/11/13).

On May 29, 2007, disability services denied Cunningham's request for reconsideration, stating that they did not believe his condition was severe enough to last 12 months in a row or to prevent him from working. [AR 73, 82.] On June 24, 2007, Cunningham filed a request for hearing, stating he was disabled. [AR 86.]

On July 30, 2007, Cunningham reported to Dr. Panek that he was slowly increasing his activities but had developed increased arch pain.  He ached when on his feet a lot.  The stinging on the bottom of his foot was greatly improved but still occurred on the other foot.  He felt soreness to the right lateral forefoot and showed some palpable pain to the plantar fascial bend.  He seemed to be worse around the base of the fourth metatarsal.  There was good fusion to the joint of the right foot.  Dr. Panek wrote that he was going to allow Cunningham to return to work "as long as he is mostly sitting."  Cunningham was taking Lyrica and Relafen.[21]  Dr. Panek refilled the prescription for Hydrocodone that was to be taken in the evenings only. [AR 415.]

On September 6, 2007, Cunningham reported to Dr. Panek that he had his first physical therapy appointment that morning and found it helpful.  He continued to recover well from multiple surgeries to the right foot and heel but was having some pain. [AR 445.] On October 1, 2007, Cunningham was discharged from physical therapy after he reached maximum improvement. [AR 445.]

On November 5, 2007, Cunningham reported significant increased pain to both feet.  He believed the Relafen helped.  The sensitivity to the plantar aspect of both feet was more reduced on

---

[21]" Relafen belongs to a group of drugs called nonsteroidal anti-inflammatory drugs (NSAIDs). It works by reducing hormones that cause inflammation and pain in the body. Relafen is used to treat pain or inflammation caused by arthritis."  http://www.drugs.com/search.php?searchterm=Relafen (2/11/13).

the right foot.  Dr. Panek noted that the subtalar joint fusion on the left and the triple arthrodesis on the right were successful.  He prescribed Cymbalta[22] for Cunningham. [AR 443.]

### *2008 Records*

On February 13, 2008, Cunningham told Dr. Panek that he had good and bad days.  Dr. Panek noted that Cunningham had a successful talonavicular joint fusion on the right foot, at least at first, and a successful isolated subtalar joint fusion on the left foot.  Dr. Panek did not feel he could be of much more assistance to Cunningham, who he considered stable for now. [AR 441.]

On March 24, 2008, Dr. Armendariz performed an IME on Cunningham for purposes of worker's compensation.  Cunningham complained of more significant pain on the right foot and ankle than the left.  He walked with an antalgic gait.  His right foot and left foot were stinging and aching.  Cunningham rated the pain a 7 on a scale of 10.  Standing and walking caused more pain. Elevating his feet helped.  Cunningham felt weakness and loss of joint motion with virtually all activities.  His pain had increased.  The tarsal tunnel release did not help and may have increased his pain.  He was not working but stated he did work light duty for awhile after his injury until he could not return after subsequent surgeries.  Dr. Armendariz noted that Cunningham's joints were well fused but that he suffered from severe degenerative changes and some mild to moderate degenerative changes.

The xrays were "very consistent" with Dr. Armendariz's physical examination of the feet. [AR 377.] Dr. Armendariz believed that Cunningham had an adequate course of physical therapy

---

[22]"Cymbalta (duloxetine) is a selective serotonin and norepinephrine reuptake inhibitor antidepressant (SSNRI). It affects chemicals in the brain that may become unbalanced and cause depression.  Cymbalta is used to treat major depressive disorder and general anxiety disorder.  Cymbalta is also used to treat fibromyalgia (a chronic pain disorder), or chronic muscle or joint pain (such as low back pain and osteoarthritis pain)."  http://www.drugs.com/cymbalta.html (2/11/13).

and that more therapy was not indicated.  Local injections might help if judicially used, and oral medications might be of significant benefit. [AR 377.] Dr. Armendariz believed that a nerve study was needed to assess damage.  He also predicted that Cunningham needed further active medical or surgical intervention. [AR 378.] Dr. Armendariz concluded that Cunningham's major complaint was more neurologic.  He was unable to complete the evaluation of disability until receiving more information from nerve conduction studies.  Dr. Armendariz found, however, that Cunningham was capable of light duty work, mostly of a sedentary nature, with limited standing and walking, no more than two (2) hours of continuous standing and walking without at least one (1) hour break from that activity.  He believed that Cunningham's light duty restrictions would be permanent and that Cunningham would require supportive care for the foreseeable future. [AR 379-80.]

On April 16, 2008, Dr. Panek noted that Cunningham was doing as well as he could do.  He had some mild arthritic changes on the left foot that might be progressive.  There were no significant changes on the left. [AR 438.]  The tarsal tunnel release of the right foot was ineffective, and Dr. Panek doubted that any bone or joint work on the right would help.  Since the right foot release failed, there was a likelihood of failure on the left.  Dr. Panek did not think he could provide more help for Cunningham.

On April 29, 2008, Dr. Radecki performed nerve conduction studies.  Cunningham was taking Lyrica and Neurontin[23] but with significant side effects.  Cymbalta helped him. [AR 408.]

On May 19, 2008, Dr. Armendariz reported on the nerve conduction results.  The study showed Cunningham continued to have entrapment of the posterior tibial nerve at the tarsal tunnel.

---

[23]"Neurontin (gabapentin) is an anti-epileptic medication, also called an anticonvulsant. It affects chemicals and nerves in the body that are involved in the cause of seizures and some types of pain." http://www.drugs.com/neurontin.html (2/11/13).

This was a bilateral finding.  There was no evidence of peripheral neuropathy in the lower extremities.  Based on this study, Dr. Armendariz believed Cunningham had an unsuccessful of the right-side tarsal tunnel release.  Cunningham might benefit from a second surgical decompression of the tarsal tunnel on the right and a first release on the left side. [AR 368.]

On July 23, 2008, Dr. Panek noted that Cunningham stated he was doing the same.  He complained of tingling to the bottoms of both feet.  The constant pain worsened.  Swelling and aching occurred more in the left foot.  Cunningham, however, admitted he was getting more and more active, but that the activities caused more aching and swelling.  He still had tarsal tunnel syndrome on both sides.  Dr. Panek thought it was time to try the tarsal tunnel release on the left side and hoped it would be more successful than the right side.  Cunningham wanted to do the procedure. [AR 437.]

On October 28, 2008, Cunningham and his attorney attended the ALJ hearing. [AR 27.] Cunningham had received worker's compensation benefits for years; he also discussed prior DIB applications in 2004 and 2005. [AR 29-32.] He was scheduled for a left foot tarsal tunnel release in November 2008.  If it was helpful, he would have his right foot done again.

Cunningham discussed his military and work history at length. [AR 35-45.] He further described the medical problems with both feet and the initial workplace accident. [AR 45.] He stated he returned to work in 1997 and 1998 after his first surgery, but that he was in a wheelchair and performed paperwork as part of an accommodation. [AR 46.] He had his second surgery in late 1998 and recuperated for a month or two. [AR 47.] Within a year, he returned to work with limitations in what he could perform. [AR 47.]

During the hearing, Cunningham's attorney argued that he believed his client met or equaled listing §§ 1.02 and 1.03 in view of his multiple surgeries and limited ability to ambulate. [AR 49.]

27

Cunningham testified that he continued to work after the 1998 surgery until he developed additional symptoms in 2004. In 2004, Dr. Panek recommended that he not do as much work. He had constant aching and stinging in his feet and ankles and could not stand or walk for more than 45 minutes. [AR 50.] He also had balance problems. If Cunningham remained on his feet for long, his pain was an 8 of 10. He had to elevate his legs at home to reduce the pain. But, the more he walked or stood, the more he had to sit and elevate. Cunningham noted that the fusion on his left foot seemed to have worked at first but then the pain returned. The improvement after the two surgeries lasted no more than three months. [AR 55.] He tried physical therapy and cortisone injections but nothing helped for long. His feet problems were consistent, with the exception of short periods after surgeries. [AR 57.] Cunningham had problems sleeping and took naps in the daytime. He could do household chores and clean up after the dogs, but he did not work in the yard for more than 30 minutes. He was taking Cymbalta for nerve damage, Nebutone for inflammation, and Hydrocodone for pain. The medications helped for up to an hour. If he tried to work or did too much, none of the medications helped. [AR 60.] He felt a loss of concentration when taking Cymbalta, and Lyrica caused him to feel lethargic.

Cunningham testified he was too embarrassed to use a cane. [AR 64.] He tended to lean on things at home when walking. He wanted to do some type of equipment operator work but feared that his feet could not handle clutches and brakes. [AR 64.] He applied for office jobs but did not have enough education. [AR 65.]

The ALJ presented a hypothetical to the vocational expert: the person could lift and carry up to 10 pounds frequently. He could sit for 6 hours and stand or walk for no more than 2 hours, and not continuously over 30 minutes at a time. He could push and pull with his upper extremities, but was never to climb ropes, ladders, or scaffolds. He could occasionally climb ramps and stairs;

28

he could not balance, crouch or crawl.  He could occasionally stoop or kneel.  There were no manipulative limitations.  He had to avoid concentrated exposure to unprotected heights and hazardous equipment.  Because of the distracting effects of pain and pain medications, he could understand and execute moderately complex instructions. [AR 66-67.]

The VE testified that Cunningham could not perform his prior work but could perform the duties of dispatcher for maintenance service, customer service representative, and call out operator. [AR 68.] The hypothetical was changed to add a limitation that Cunningham be allowed to elevate his feet at least to 12 inches while seated to relieve pain.  The VE testified this change would depend on the work environment.  It might be distracting to have to elevate his feet and concentrate enough to do other work. [AR 69.]

On October 29, 2008, Cunningham provided an assessment from Dr. Panek stating that Cunningham needed to elevate both legs every 2-4 hours for 15-30 minutes for pain and swelling. [AR 447.] On November 7, 2008, Dr. Panek's notes indicate that Cunningham was scheduled for a tarsal tunnel release on the left side.  The surgery was performed on November 13, 2008. [AR 454, 457.]

### *2009 Records*

On April 3, 2009, Cunningham provided an updated report from Dr. Panek to the ALJ.  It had been about 4-5 months since the tarsal tunnel release of the left foot.  Cunningham reported increased pain like he had before surgery and generally lost a lot of benefits he initially felt from surgery.  It appeared to Dr. Panek that Cunningham was going to end up with "about the same mild benefits from this release on the left" as he had on the right.  He still complained of stinging pain to the bottoms of both feet.  He believed the pain was reduced but it still came and went and could

29

be intense.  There was sharp stabbing pain that sometimes occurred around the right plantar lateral forefoot.

Dr. Panek's note indicated that Cunningham was getting more active and had played 18 holes of golf yesterday, while using a golf cart.  Although he really liked playing, by the end of the day he was "incredibly miserable," with worse pain.  On examination, Dr. Panek did not see swelling, but Cunningham had significant hypersensitivity that extended from the forefoot to midfoot and a bit more mildly to his rear foot and ankle.  The pain was more palpable around the plantar lateral left rear foot and midfoot.  The maximum area of pain on the right foot was beneath the right fourth metatarsal shaft.  Dr. Panek's assessment was that Cunningham was "still significantly disabled." While he benefitted somewhat from the release procedures, he still "has considerable pain and stinging that remains to plantar aspect of both feet."  Cunningham had multiple fusions on both feet so the strain of supporting structures and future degenerative change to other joints was a real possibility.  He was prescribed Hydrocodone for pain as needed.  He took Ultram[24] daily. [AR 221-22.]

On July 23, 2009, Cunningham's attorney wrote to the ALJ, noting that he had submitted the last medical records many months ago, but there still was no decision.  Counsel offered to submit a proposed order to the ALJ. [AR 198.]

On August 18, 2009, Cunningham saw a pain specialist, Pamela Black.  She informed Dr. Panek that Cunningham rated his pain about 6-7 out of 10.  The pain awakened him at night, and walking, standing, or climbing aggravated the pain.  He had trigger point injections.  He was using

---

[24]"Ultram (tramadol) is a narcotic-like pain reliever. Ultram is used to treat moderate to severe pain." http://www.drugs.com/search.php?searchterm=Ultram (2/11/13).

a cane that was too short, and Ms. Black prescribed a new cane for him.  Ms. Black noted mechanical dysfunction in both feet.  She understood Cunningham to be retired. [AR 464.]

On September 4, 2009, Ms. Black noted that Cunningham canceled his September 1 appointment with her.  He had run out of Hydrocodone 2½ weeks ago and had been taking Cymbalta, but he quit that medication because of poor sleep.  He continued taking Ultram, which he felt helped his pain, but had not obtained a TENS unit as prescribed.  He also tried morphine but ran out of it.  In addition, it had side effects.  He had some Percocet.  He obtained the new prescribed cane that helped.  He brought in an application for a handicapped hunting license. [AR 462.]

On September 22, 2009, Cunningham again saw Ms. Black, who found he was not using his medications appropriately.  A urine test was positive for Oxycodone and Oxymorphone, neither of which he was to take.  He stated he would increase the Ultram to help with pain.  His pain was not much improved, but he suspected it might be because he had gone elk hunting.  He rode in the truck most of the time but also did some scouting.  The trip may have exacerbated the pain.  He complained of numbness in his feet.  Ms. Black noted that he used the cane to transition from sitting to standing and to ambulating. [AR 460-61.]

On November 13, 2009, Ms. Black saw Cunningham gain.  His pain had increased, and he requested refills of his medications.  He reported having gone on a 12-day elk hunting trip in the mountains.  He used an AV to get around.  The hunting activity and cold weather in the mountains might have increased his pain.  He was not taking Opana[25] as he ran out of it, but he believed Opana

---

[25]"Opana (oxymorphone) is a opioid pain reliever. It is similar to morphine. An opioid is sometimes called a narcotic. Opana is used to treat moderate to severe pain." http://www.drugs.com/search.php?searchterm=Opana (2/11/13).

helped.  He stated his insurance plan did not approve the TENS unit.  He felt pain bilaterally and stinging pain. [AR 478.]

On November 19, 2009, Dr. Armendariz performed another IME to re-evaluate Cunningham's condition.  Both feet and ankles bothered him.  He was taking Ultram, Hydrocodone and Opana.  His current diagnosis was status post mid and hindfoot fusion.  Dr. Armendariz believed his present residual pain was substantiated by physical exam, clinical testing, and the positive EMG nerve conduction study.  He was now under more advanced pain management than what would normally be considered part of an orthopedic practice.   Cunningham required chronic pain management. [AR 472.] Dr. Armendariz believed Cunningham's pain or condition was permanent or stationary at that point and that he could be handled with supportive care from pain management, with approximately four visits a year.  He did not need further active medical or surgical treatment. He previously was rated 24% impaired to lower extremities and 10% impairment of the whole person.  Dr. Armendariz believed this was accurate. [AR 473.] Cunningham could not perform regular work but could do light duty work.  He was not to lift over 30 pounds and not to engage in repetitive lifting of over 10 pounds.  He could not stoop or bend on a continued basis.  He could not stand or walk for prolonged periods of time on uneven terrains.  These were permanent restrictions. [AR 474.]

On December 14, 2009, Ms. Black saw Cunningham for ankle and foot pain.  He needed refills on his medications.  He was doing home exercises.  Ms. Black found he could return to work with permanent restrictions, although again she noted that she believed Cunningham was retired. [AR 481-82.]

### *2010-2011 Records*

On March 15, 2010, Ms. Black saw Cunningham for chronic foot pain.  He increased his activities which caused more pain.  He was more active with his children and took them to after-school activities.  He walked more.  He had been out of medications for two weeks.  Since running out of Opana, Cunningham was taking "little bits" of Hydrocodone.  He was given Ultram and Opana. [AR 483.]

On March 23, 2010, the ALJ wrote to Cunningham's attorney, stating she realized the case had been pending almost 18 months and that she was giving it high priority.  Because of the date when evidence was last submitted, she asked counsel to send copies of records generated since the hearing date of October 28, 2008. [AR 200.]  On June 4, 2010, Cunningham's attorney wrote the ALJ and send a few recent records and reports. [AR 202.]  On September 20, 2010, the ALJ issued an unfavorable decision, finding that Cunningham was not disabled. [AR 13-22.]

On October 18, 2010, Cunningham's attorney wrote to Dr. Panek, attaching the ALJ's decision.  Counsel believed the ALJ might have been incorrect in deciding there was not a period of at least 12 months since July 23, 2004, when Cunningham was disabled.  He also believed Cunningham might have met a listing.  Counsel though the ALJ misinterpreted the information provided by Dr. Panek regarding whether there was an objective medical cause for Cunningham's stinging and burning pain.  Counsel asked Dr. Panek whether he thought Cunningham met a listing for any 12 month period of time since July 23, 2004.

Dr. Panek filled out the enclosed form, opining that Cunningham met listing § 1.03 for the time period of January 12, 2005 to September 6, 2007. [AR 217.] Dr. Panek based his opinion on the three surgeries on January 12, 2005, July 25, 2005, and March 21, 2007.  Dr. Panek wrote: 'I saw Mr. Cunningham frequently during this time period.  He was unable to effectively ambulate due

33

primarily to pain from 1/12/05 to 9/6/07.  My office notes during this time support the finding."  He

identifying numerous treatment notes by date. [AR 218.]

On November 17, 2010, Cunningham's attorney submitted a letter to the Appeals Council.

[AR 203.] There are no medical records from 2011.  On February 2, 2012, the Appeals Council

denied the request for review.  It considered Cunningham's attorney's letter dated November 17,

2010, and the correspondence, dated October 18, 2010 and May 18, 2009, along with Dr. Panek's

medical source statement, dated April 3, 2009.  [AR 1-5.]

**VI.**   **DISCUSSION**

A.     Alleged Legal Errors

Cunningham alleges that the evidence of record established that he met Listing § 1.03. [Doc.

22, at 4-5.] The Appeals Counsel received Dr. Panek's November 2010 opinion that Cunningham

met the definition of the listing from January 12, 2005 to September 6, 2007.  According to

Cunningham, that information, along with the medical evidence already part of the record,

established that the ALJ erred when she determined that Cunningham did not meet a listing at step

three of the sequential process. [Id., at 6.]

Cunningham also argues that the ALJ improperly relied upon VE testimony that contained

an incomplete RFC finding – specifically, that the hypothetical failed to consider Cunningham's

need to elevate his legs, as documented by Dr. Panek.  Thus, Cunningham contends that the ALJ's

decision was not supported by substantial evidence.  According to Cunningham, the VE testified that

the need to elevate one's legs would prevent Cunningham from performing the three jobs she

identified at the hearing.

In addition, Cunningham asserts that the ALJ's credibility finding was contrary to the

evidence.  For example, Cunningham argues that the ALJ's finding that his pain was generally well

controlled with medications and improved by surgeries was contrary to the medical evidence.  In addition, Cunningham contends that the ALJ erred in relying on Cunningham's reported activities, such as elk hunting.  Such activities, according to Cunningham, were minimal.

    B.    Analysis

        1)    **STEP THREE FINDINGS**

The listing on which Cunningham relies is § 1.03 – "Reconstructive surgery or surgical arthrodesis of a major wight-bearing joint, with inability to ambulate effectively, as defined in 1.00B2b, and return to effective ambulation did not occur, or is not expected to occur, within 12 months of onset."  Section 1.00B2b(1) states:

> [i]nability to ambulate effectively means an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities.  Ineffective ambulation is defined generally as having insufficient lower extremity functioning (*see* 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities.

Section 1.00B2b(2) defines the phrase "ambulate effectively," as follows:

> individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living.  They must have the ability to travel without companion assistance to and from a place of employment or school.  Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail.  The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.

In addition to the medical evidence presented to the ALJ, Cunningham argues that the evidence supplied to the Appeals Council, that becomes part of the record, constitutes substantial evidence supporting a step three finding that Cunningham met requirements of § 1.03.

It is undisputed that between 1997 and 2008, Cunningham had seven different operations to his two feet, most of which were extensive surgeries. While some of the surgeries, treatment and medications initially helped Cunningham, ultimately, Dr. Panek found Cunningham's condition and pain remained about the same. Notwithstanding numerous surgeries, various worker's compensation specialists and podiatrists continued to recommend additional surgeries through the years for Cunningham's various diagnoses.

Cunningham specifically relies on Dr. Panek's November 2010 opinion, submitted only to the Appeals Council. [AR 217-18.] In an October 18, 2010 letter to Dr. Panek (after the ALJ's unfavorable decision), Cunningham's attorney asked Dr. Panek to review the pertinent listing requirements for § 1.03 and provide an opinion whether Cunningham met the requirements for 10 months or longer at any time after July 23, 2004. [AR 215.] Dr. Panek responded on November 8, 2010, opining that Cunningham met that listing from January 12, 2005 to September 6, 2007. [AR 217.] In support, Dr. Panek noted three surgical procedures during that time frame, one on January 12, 2005, another on July 25, 2005, and the third on March 21, 2007. [AR 218.] Dr. Panek further wrote that he saw Cunningham frequently during that period and that Cunningham was "unable to effectively ambulate due primarily to pain." Dr. Panek referred to his office notes to support his conclusion, *e.g.,* those notes dated 1/12/05, 1/19/05, 1/26/05, 2/16/05, 3/9/05, 4/1/05, 4/22/05, 5/27/05, 7/11/05, 7/14/05, 7/21/05, 7/25/05, 8/1/05, 8/8/05, 9/1/05, 9/23/05, 10/14/05, 11/4/05, 12/2/05, 1/10/06, 2/07/06, 3/14/06, 4/13/06, 5/11/06, 5/26/06, 7/6/06, 8/24/06, 9/22/06, 10/20/06, 1/8/07, 2/8/07, 3/15/07, 3/21/07, 4/4/07, 4/27/07, 5/25/07, 7/30/07, and 9/6/07. [AR 218.]

36

The Commissioner responds to this argument by generally asserting that substantial evidence supported the ALJ's finding that Cunningham was never precluded from ambulating effectively for a period of twelve consecutive months. [Doc. 24, at 5.] Defendant asserts that Cunningham did not satisfy his burden of demonstrating how the evidence showed that he met listing requirements. The Commissioner further claims that Dr. Panek's November 2010 opinion referred to treatment notes already considered by the ALJ. Thus, according to Defendant, Cunningham did not provide any "new evidence" to the Appeals Council. [Doc. 24, at 6.] Moreover, the Commissioner states that certain medical records contradict "Dr. Panek's *ex post* claim that [Cunningham] remained unable to ambulate effectively throughout this period." [Id.]

The Court concludes that Dr. Panek's medical statement concerning Cunningham's inability to ambulate effectively during the pertinent time frame is "new and material" evidence submitted to the Appeals Council.[26] "The Appeals Council must consider additional evidence offered on administrative review—after which it becomes a part of our record on judicial review—if it is (1) new, (2) material, and (3) related to the period on or before the date of the ALJ's decision." Krauser v. Astrue, 638 F.3d 1324, 1328 (10th Cir. 2011) (*citing* Chambers v. Barnhart, 389 F.3d 1139, 1142 (10th Cir. 2004) (discussing 20 C.F.R. §§ 404.970(b), 416.1470(b)). While Dr. Panek referred to earlier medical records for support, his opinion that Cunningham was not able to ambulate effectively from January 12, 2005 to September 6, 2007 is new, material, and pertinent to the relevant time period.

---

[26]It is assumed that the evidence submitted to and accepted by the Appeals Council met the requirements of "new and material." *See* Krauser v. Astrue, 638 F.3d 1324, 1328 (10th Cir. 2011) ("when the Appeals Council accepts additional evidence, that is 'an implicit determination [that it is] ... qualifying new evidence' requiring the Appeals Council to consider it and this court to include it in our review of the ALJ's decision, without separate consideration of the requirements for qualification.") (internal citations omitted).

Cunningham's argument might be articulated as one that the Tenth Circuit generally rejects, *i.e.,* "the Appeals Council should be required to state in a clear and concise manner their analysis of new and material evidence submitted to them." Robinson v. Astrue, 397 F. App'x 430, 432 (10th Cir. Aug. 31, 2010) (unpublished).   In Robinson, the Tenth Circuit determined that the Appeals Council provided a sufficient explanation, *albeit* perfunctory, when it stated that it considered the new evidence, made it part of the record, and found no basis for changing the ALJ's decision.   Thus, if the Appeals Council explicitly states that it considered the evidence, courts generally conclude that there was no error, even if the order denying review includes no significant discussion of the new evidence.   *See* Martinez v. Barnhart, 444 F.3d 1201, 1207-08 (10th Cir. 2006) (noting that analysis of new evidence by the Appeals Council would have been helpful, but was not required); *cf.* Threet v. Barnhart, 353 F.3d 1185, 1191-92 (10th Cir. 2003) (reversing and remanding where Appeals Council gave no indication that it considered qualifying new evidence).

In this case, the situation may be closer to the facts in Threet, where the Appeals Council failed to indicate that it considered qualifying new evidence.   Here, Dr. Panek opined on November 8, 2010, that Cunningham was not able to effectively ambulate during consecutive 12-month periods from January 2005 to September 2007, a time frame that spanned three separate surgeries.   The Appeals Council specifically identified the additional evidence submitted as constituting Exhibit 13, Representative's brief, dated November 17, 2010, and representative's correspondence, dated October 18, 2010, along with Exhibit 18F, an earlier medical update note by Dr. Panek, dated April 3, 2009.   The Appeals Council technically made Dr. Panek's November 8, 2010 opinion part of the record, when it listed additional evidence that included Dr. Panek's letter and "representative's correspondence." [AR 1-2.] But, that list never specified or identified Dr. Panek's November 8, 2010 opinion [AR 5] that was attached to counsel's correspondence.   Still, the Court must assume

that the Appeals Council reviewed all of the attachments to counsel's brief.  The Court merely observes that it is far from clear whether the Appeals Council actually reviewed Dr. Panek's November 8, 2010 opinion, in view of the Council's boilerplate denial of the request for review and general list of exhibits.

The question this Court must decide is whether substantial evidence supports the ALJ's decision in light of the entire record, including the above-discussed new evidence.  *See* Martinez, 444 F.3d at 1208.

The Court examines the ALJ's discussion of medical records along with the specific medical records to which Dr. Panek referred in opining that Cunningham was not able to effectively ambulate for a consecutive period of 12 months, from January 12, 2005 to September 6, 2007.  The ALJ reviewed Cunningham's accident and resulting surgeries. [AR 15-16.] The ALJ briefly mentioned listing § 1.03, finding that Cunningham did not meet or equal the listing.  The ALJ did not discuss the definition of "effective ambulation" or analyze Cunningham's ability to effectively ambulate based on the medical evidence.  The ALJ's sole comment concerning Cunningham's effective ambulation is that Cunningham was able to ambulate effectively between surgeries after postoperative periods "not exceeding 3 months." [AR 16.] Essentially, this terse comment indicates, that the ALJ found Cunningham was not precluded from effective ambulation for consecutive periods of 12 months at any time; at most, in the ALJ's opinion, Cunningham was prevented from effective ambulation for periods of no more than three (3) months following each surgery.

The medical records, along with Dr. Panek's November 8, 2010 opinion, do not support the ALJ's finding.  The medical records from the period, January 2005 to September 2007,  indicate Dr. Panek's <u>expectation</u>, at times, that Cunningham would be recovered from his surgeries in three to four months after the procedures.  However, the medical records demonstrate that this did not occur.

Instead, while Cunningham initially improved after some of the surgeries, he eventually had more problems after surgeries and developed new conditions with new diagnoses and related pain in 2006, prompting a third surgery in March 2007.

The medical records confirm that Cunningham had extensive surgery on his left foot on January 12, 2005, and that Dr. Panek saw him regularly after the surgery. [AR 15-16.] Cunningham was wearing a splint, was given a below-the-knee non weight bearing cast, and still had "on and off intense pain." He was strictly non-weight bearing with the use of crutches on January 26, 2005. [AR 258-260.] As of February 16, 2005, Cunningham was still non-weight bearing. He was placed in a below-the-knee weight bearing cast on this date but could place no weight on the leg for another week. [AR 257.]

On March 9, 2005, Cunningham tried some partial weight bearing while in a cast using crutches, and complained of achiness and a lot of swelling within the cast. Dr. Panek expected him to progress to full weight bearing in the next few days to a week, at which point he would be given a walking boot. [AR 256.]

By April 1, 2005, Cunningham had stopped using the crutches and was walking better in the cast. He was placed in a removable walking boot, but even as of April 1, 2005, Dr. Panek stated Cunningham could only do "sit down" work. Dr. Panek wanted Cunningham to be fully recovered before performing surgery on the right foot. [AR 255.]

On April 22, 2005, Cunningham could be on his foot for 45 minutes to an hour before having significant pain and throbbing. Cunningham was to begin to use normal shoes but was still obviously limited. [AR 254.] Even if this date signals the beginning of a time frame when Cunningham could ambulate effectively, in July 2005, he had the same type of extensive surgery on the other foot. Again, he was non-weight bearing through August. [AR 248-250.] He would

progress to some weight bearing using his crutches in September 2005. [AR 248.] He was in a walking boot by the end of September 2005. [AR 247.]

In October 2005, Cunningham stated he could not get rid of the aching and pain and was discouraged.  He had increased pain when he progressed into normal shoes.  Dr. Panek believed Cunningham should "probably be returning to the walking boot at times for longer weight bearing activities. . . ." [AR 246.] On November 4, 2005, Cunningham appeared better from the July surgery. He had been in normal shoes for two weeks although he still had some pain. [AR 245.] However, in December 2005, Cunningham reported having seen no improvement.  Dr. Panek thought he should be showing more significant improvement by this date and referred him to physical therapy. [AR 244.]

By January 2006, Cunningham appeared improved and recovered although still in a lot of discomfort.  Dr. Panek questioned whether he had tarsal tunnel syndrome. [AR 242.] He was intermittently wearing braces in February 2006. [AR 240.] He continued to need narcotic pain medication.  The records do not clearly show that Cunningham could effectively ambulate at this point, although he was improved.  Nerve conduction studies in April 2006, however, confirmed Cunningham had bilateral tarsal tunnel syndrome. [AR 451.] Physical therapy was discontinued as there were no signs of recovery.  In May 2006, Dr. Panek injected the painful left foot, but Cunningham felt relief for only five days. [AR 236.] By September 2006, Dr. Panek knew that Cunningham would need additional surgery for tarsal tunnel syndrome. [AR 234.]

In January 2007, Cunningham tried to live with the pain but was worse.  He wanted surgery on the right foot and did not feel he could live with such "disabling pain." [AR 320.] On March 15, 2007, Dr. Panek noted that Cunningham would be scheduled for multiple foot surgeries and that he had increasing disabling pain.  [AR 314.] On March 21, 2007, Cunningham had surgery on the right

41

foot. [AR 302.] He was non-weight bearing into early May 2007. [AR 311.] On July 30, 2007, Dr. Panek noted Cunningham's continuing complaints of foot pain and his continued slow recovery from surgery.  He stated he would allow Cunningham to return to work "as long as he is mostly sitting." [AR 415.] On September 6, 2007, Dr. Panek noted that Cunningham was doing very well and thought physical therapy was helpful. [AR 445.]

Based on this summary of medical records upon which Dr. Panek relied in finding Cunningham was not able to effectively ambulate for consecutive 12-month periods between January 2005 and September 2007, the Court concludes that substantial evidence does not support the ALJ's step three finding with respect to that specific time frame.  The Court observes that the ALJ selectively relies on certain statements from Dr. Panek's medical notes to show Cunningham's improvement [*see, e.g.,* AR 17], but that is improper.  *See* Hardman v. Barnhart, 362 F.3d 676, 681 (10th Cir. 2004) ("[i]t is improper for the ALJ to pick and choose among medical reports, using portions of evidence favorable to [her] position while ignoring other evidence.").  Taken in context, other portions of those medical notes, and other records of treatment immediately following improvement by Cunningham confirm continued problems, pain, new diagnoses, and the need for additional surgeries.

### 2)      <u>STEP THREE AWARD</u>

The Court determines that Cunningham should be immediately awarded DIB benefits for the period of January 12, 2005 to September 6, 2007, because substantial evidence supports a finding that Cunningham met listing § 1.03 during that time frame.  There is no reason to remand for additional administrative procedures as to this issue, when the evidence was amply developed at all pertinent times.  Moreover, the Court also observes that disposition of this matter was significantly delayed over a period of six years.

Regarding the time period from onset date of July 23, 2004 through January 12, 2005, there are only a few medical records.  Those records indicate that Cunningham needed foot surgery but was able to stand for four (4) hours, in the opinion of Dr. Leonetti on November 17, 2004. [AR 425.] The Court finds that substantial evidence supports the ALJ's decision that Cunningham was able to effectively ambulate for that period of time.

With respect to the time period from September 6, 2007 to December 31, 2009, the date Cunningham was last insured, the medical records indicate that Cunningham was doing very well in September 6, 2007, but having more pain by November 5, 2007. [AR 443, 445.] On February 13, 2008, Dr. Panek noted Cunningham was stable, he had good and bad days, and his right side fusion was successful, at least at first. On March 24, 2008, Dr. Armendariz concluded that Cunningham could perform light-duty work, with no more than two hours of continuous standing and walking without at least a one-hour break from that activity. [AR 379-80.] In July 23, 2008, while Cunningham had worsened pain, he was getting more and more active. [AR 437.] Dr. Panek performed another surgery in November 2008. [AR 454.] In April 2009, Cunningham was able to play 18 holes of golf, although he was in pain by the end of the day. [AR 221.] He applied for a handicapped hunting license in about September 2009. [AR 462.] In November 2009, Cunningham went on a 12-day elk hunt in the mountains. [AR 478.]

In 2010, when Cunningham's attorney contacted Dr. Panek to inquire if Dr. Panek found that Cunningham was unable to effectively ambulate during any of the pertinent time frame, Dr. Panek omitted time periods leading up to the January 2005 surgery and subsequent to his recovery in September 2007.  The Court concludes that the medical records and the daily activity reports from 2008-2009, support the ALJ's decision that Cunningham did not demonstrate he was unable to ambulate effectively during those periods, and therefore, did not meet listing § 1.03 for those time

frames.  Thus, the Court finds no error by the ALJ as to those specific time frames, *i.e.,* July 23, 2004 through January 12, 2005, and September 6, 2007 through December 2009, and the Court does not order immediate award of benefits to Cunningham for those periods, in relation to a step-three listing.

### 3) HYPOTHETICAL TO VOCATIONAL EXPERT

Cunningham also argues that the ALJ improperly relied on VE testimony that contained an incomplete RFC finding. [Doc. 27, at 7.] According to Cunningham, the failure to consider Cunningham's need to elevate his legs renders the ALJ's decision unsupported by substantial evidence. [Doc. 22, at 8.]

During the hearing, the ALJ provided an initial hypothetical to the VE, containing a number of limitations.  [AR 65-67.] The VE testified that Cunningham could perform certain positions with those limitations. [AR 68-69.] The ALJ then changed the hypothetical to add a limitation "that the work would have to allow elevation of the feet at, at least, a 12-inch height while seated as necessary to relief pain . . . ." [AR 69.] The VE testified that her "guess" was that this type of limitation would be distracting depending on the individual's job requirements and work environment.  She further stated that the elevation limitation "might interfere with the concentration of the individual and being able to perform those jobs, all three." [AR 69.]

In her decision, the ALJ gave treating physician Dr. Panek's opinions "great weight."  She specifically noted Dr. Panek's "Assessment Form-Elevation of Legs," that Dr. Panek completed on October 29, 2008, wherein Dr. Panel indicated that Cunningham must elevate both legs to heart level every "2-4 hours, for 15 to 30 minutes, due to pain and swelling."  [AR 20.] The ALJ observed that no other physician indicated such elevation was necessary, but that such restrictions "are not inconsistent with work with normal breaks." [AR 20.] The ALJ proceeded to discuss the ALJ's

testimony, concluding that the VE's testimony supported the finding that Cunningham could perform the requirements of the three identified occupations. [AR 21.]

This is not a case where the ALJ failed to present the VE a hypothetical containing all of the limitations found to exist.  *See, e.g.,* Barnett v. Apfel, 231 F.3d 687, 690 (10th Cir. 2000) (sufficient hypothetical to VE contains all of the limitations found to exist by the ALJ).  The VE presented the additional hypothetical to the VE addressing Cunningham's need to elevate his feet at work.  However, the ALJ's interpretation or summation of the VE's testimony about the impact of Cunningham's need to elevate his feet on his ability to perform the three identified occupations is inaccurate and unsupported.  *See, e.g.,* Stubblefield v. Chater, 105 F.3d 670 (Table, Text in Westlaw), 1997 WL 4279, at *3 (10th Cir. Jan. 7, 1997) (unpublished) (remanding, in part, because even assuming the ALJ's hypothetical was legitimate, ALJ misconstrued the VE's testimony in response to it).

Here, the VE testified, *albeit* with some guesswork, that Cunningham would probably not be able to perform the three positions if required to elevate his feet in accordance with the revised hypothetical.  The ALJ made no mention of the VE's testimony in this regard and simply concluded, without any supporting evidence and in conflict with the VE's testimony, that the elevation restrictions were "not inconsistent with work with normal breaks." [AR 20.]

The Court concludes that the ALJ committed error in this regard and, therefore, that her RFC finding is not supported by substantial evidence.  With respect to the period of alleged disability, subsequent to September 6, 2007, the Court remands for further administrative proceedings to determine the appropriate RFC.  The ALJ may decide that more evidence or more testimony by the VE is required with respect to Cunningham's purported need to elevate his feet at work.

### 4)       CREDIBILITY FINDINGS

"Credibility determinations are peculiarly the province of the finder of fact," although such findings "should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings." Kepler v. Chater, 68 F.3d 387, 391 (10th Cir. 1995) (alteration and internal quotation marks omitted).  The reviewing court does not substitute its own judgment for that of the fact finder.  Moreover, a reviewing court recognizes "that some claimants exaggerate symptoms for purposes of gaining government benefits, and that deference to the fact-finder's assessment of credibility is the general rule." Frey v. Bowen, 816 F.2d 508, 517 (10th Cir. 1987).  In addition, Tenth Circuit precedent "does not require a formalistic factor-by-factor recitation of the evidence so long as the ALJ sets forth the specific evidence he relies on in evaluating the claimant's credibility." Poppa v. Astrue, 569 F.3d 1167, 1171 (10th Cir. 2009) (alteration and internal quotation marks omitted).

In evaluating a claimant's credibility as to symptoms, the Commissioner considers all symptoms that can reasonably be accepted as consistent with the objective medical evidence and other evidence, reports of doctors, diagnoses, prescribed treatment, daily activities, efforts to work, and any other pertinent evidence.  20 C.F.R. § 404.1529(a).  A claimant's statements about pain or other symptoms alone does not establish disability.  Id.  In evaluating the intensity and persistency of symptoms and pain, the Commissioner considers all available evidence, including what medications have been used, how the symptoms affect a claimant's pattern of daily living, the location, duration, frequency, and intensity of pain, precipitating and aggravating factors, type, dosage, effectiveness of medications, treatment, or other measures used to relieve pain.  20 C.F.R. § 404.1529(c)(3); SSR 96-7p.

46

Cunningham argues that the ALJ's credibility findings are contrary to the evidence.  He states that the ALJ rejected his credibility based on the judge's inaccurate or unsupported findings that Cunningham's "pain was generally well controlled with medication and improved with surgeries," that Cunningham was "able to effectively ambulate between surgeries after postoperative periods not exceeding three months," and his activities in 2009, like elk hunting, taking his children to school, and playing golf. [Doc. 22, at 10.]

The Commissioner disagrees, arguing that the medical evidence suggests that Cunningham's ailments were not as severe as he claims.  The Commissioner asserts, for example, that the "ALJ highlighted medical evidence showing that Plaintiff's foot pain was not as unrelenting as Plaintiff claimed." [Doc. 24, at 13.] The ALJ also found that medical records demonstrated Cunningham's medicinal side effects were overstated. [Id.] And, the ALJ emphasized that Cunningham's daily activities revealed his "ability to perform at least a range of sedentary work activities." [Id.] Notwithstanding these findings, the Commissioner argues that the ALJ "still assessed a restrictive RFC that outstripped the limitations thought necessary by the state-agency experts." [Id., at 14.]

The Court observes that Cunningham had at least seven foot surgeries over a 12-year period. The physicians examining and treating Cunningham consistently agreed that surgeries did not resolved all of Cunningham's pain and problems and recommend additional surgeries.  Dr. Panek regularly treated Cunningham.  He ordered extensive testing, including multiple xrays of the feet, bone scans, MRIs, several EMG/nerve conduction studies, and CT scans.  Physicians prescribed a number of different treatments and assistive devices for Cunningham, including several rounds of physical therapy, trigger point and cortisone injections, crutches, casting, walking boots, braces, orthotics, and a cane.  The list of medications prescribed by physicians is exhaustive and indicative of Cunningham's ongoing and unresolved pain, the inefficacy of many medications, and the side

47

effects of certain medications.  For example, Cunningham's list of prescribed medications from 2004 to 2009 are: Arthrotec, Vicodin, Bextra, Percocet, Darvocet, Celebrex, Advil, Opana, Ultram, Nebutone, Cymbalta, Neurontin, Mobic, Lyrica, Hydrocodone, Relafen, Naprosyn, Roxicet, and Ambien.  Many medical records document Cunningham's repeated prescriptions for certain of these medications and also his complaints of various side-effects from medications.

Notwithstanding extensive surgeries, treatments, and prescribed medications, the ALJ stated that in terms of Cunningham's "alleged foot pain, treatment records indicate that his pain was generally well controlled with medications and improved with surgeries." [AR 17.] Contrary to the ALJ's findings, the medical records, as discussed above, indicate that improvements post surgery were temporary in nature, that pain continued to develop, and that additional surgeries were recommended and performed.  Based on the medical records, Cunningham's pain was not at all "well controlled."  Dr. Panek tried numerous prescriptions for pain relief, many of which were ineffective.  Dr. Panek continued to repeatedly prescribe Percocet for Cunningham's pain.  The Court determines that substantial evidence does not support the ALJ's findings that Cunningham's pain was well controlled, that surgeries improved his condition, or that the side effects of medications were overstated.

In support of the finding that Cunningham's complaints about side effects from medications were "not a significant or ongoing complaint," the ALJ identified a single medical record from December 14, 2009, when Cunningham saw pain specialist, Dr. Black. [AR 18.] That record stated that while Cunningham had ankle and feet pain and needed medication refills, he had "no concerns about his medications."  It is not entirely clear what Dr. Black's statement reflected since earlier and later records showed that Cunningham was not taking his medication properly or that he had run out of prescriptions.  For example, on March 15, 2010, Dr. Black noted the urine drug screen done on

December 14, 2009 that showed Cunningham was taking hydrocodone and hydromorphone but she further observed that Cunningham was "inconsistent, as there was no oxymorphone in his system." [AR 483.]

On November 13, 2009, Cunningham's concerns about medications appeared to be that he had been out of town and run out of his refills on medications.  He had not been taking Opana. [AR 478.] On that same date, some of the other concerns Cunningham had with his medication involved "problems from the adjustor per the pharmacist" in obtaining the prescriptions for Opana. [AR 479.] Dr. Black told Cunningham that she could not write the prescription for Opana for longer than 30 days.  On September 4, 2009, Dr. Black noted that Cunningham ran out of Hydrocodone 2½ weeks before his appointment, ran out of Morphine three weeks before the appointment, and stopped taking Cymbalta because of poor sleep and nightmares.  Cunningham also told Dr. Black that worker's compensation did not authorize certain prescriptions. [AR 462.] On September 22, 2009, Dr. Black noted that Cunningham was not using his medications appropriately, running out of medications, and using left over medications.  Dr. Black then discussed with Cunningham "his pain agreement and his medications usage." [AR 460.]

The ALJ interpreted Dr. Black's vague comment that Cunningham had "no concerns about his medications," to mean that he had no complaints about side effects.   However, a careful review of Dr. Black's records indicate there were various other concerns that were being addressed about Cunningham's use of medications in 2009.  It is not at all clear from that single reference that Cunningham complained of no side effects from medications.  Thus, the Court finds substantial evidence does not support the ALJ's finding that Cunningham's complaints about side effects of medications were insignificant.  The medical records are replete with complaints about side effects.

49

The Court also examined the ALJ's discussion of Cunningham's daily activities and in particular, her reliance on Cunningham's elk hunting trips and increased activities with his children in 2009 and 2010. [AR 18.] In addition, the ALJ referred to Cunningham's function reports that described some of his usual daily and weekly activities, like cooking a little, feeding and watering his dogs, doing yard work for two hours once every week or two, vacuuming for 30 minutes and washing dishes for about an hour every week. [AR 18.] Cunningham went hunting once or twice a year and golfed once or twice a year, while using a golf cart. [AR 19.]

The Court does not find that these minimal home-related activities, isolated hunting trip(s) in 2009, and discussion of Cunningham's daily activities constitute substantial evidence supporting the ALJ's determination that Cunningham's statements about the intensity, persistence and limiting effects of his symptoms were not credible. [AR 17-19.]

In sum, the Court determines that the ALJ's credibility findings are not "closely and affirmatively linked to substantial evidence," and accordingly, that substantial evidence does not support the credibility findings. Thus, the Court remands for additional administrative proceedings on the issue of credibility, for the period after September 6, 2007.

C.    Conclusion

The Court concludes that Cunningham's motion to reverse or remand will be granted, consistent with this opinion. The Court directs that this matter be remanded for an immediate award of benefits for the closed period of January 12, 2005 to September 6, 2007. It also is remanded for additional administrative hearings with respect to the RFC and credibility findings for the period, September 6, 2007 to December 31, 2009.

IT IS THEREFORE ORDERED that Cunningham's motion is GRANTED, as described herein.

_Lorenzo F. Garcia_

Lorenzo F. Garcia
United States Magistrate Judge